UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Roger Lee Cantelupe, | : | Civil No. 1:15-CV-00410 |
| | : | |
| Plaintiff, | : | (Judge Kane) |
| | : | (Magistrate Judge Saporito) |
| v. | : | |
| | : | |
| Carolyn W. Colvin, | : | |
| Acting Commissioner of | : | |
| Social Security | : | |
| | : | |
| Defendant. | : | |

REPORT AND RECOMMENDATION

I.   INTRODUCTION

Plaintiff, Roger Lee Cantelupe ("Cantelupe"), an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3).

This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the

Federal Rules of Civil Procedure.  For the reasons expressed herein, we have found that the final decision of the Commissioner of Social Security is supported by substantial evidence.  Accordingly, it is recommended that the final decision of the Commissioner denying Cantelupe's claims for benefits be AFFIRMED, and that Cantelupe's request for a new hearing or the award of benefits be DENIED.

II.   FACTS AND PROCEDURAL HISTORY[1]

On the date the ALJ issued her decision, Mr. Cantelupe was fifty-three years old.   He most recently worked as a satellite installer, but stopped working on November 15, 2005 because his employer moved the company to Georgia.  (Admin Tr. 272).  Cantelupe was forty-five years old on his alleged onset date.

---

[1]The record submitted to this docket contains some new information that was submitted to the Appeals Council but was not before the ALJ when she issued her decision.  Cantelupe has not raised the issue of whether remand is warranted for the consideration of new evidence, and instead argues that the ALJ's decision is not supported by substantial evidence. "Although evidence considered by the Appeals Council is part of the administrative record on appeal, it cannot be considered by the District Court in making its substantial evidence review once the Appeals Council has denied review." Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001). As such, we have excluded any exhibits that were not available to the ALJ from our discussion of the evidence in this case.

On November 16, 2011, Cantelupe protectively filed applications for benefits under Titles II and XVI of the Social Security Act.  In both applications he alleged that, beginning December 23, 2006, he was no longer able to work due to the impairments of: degenerative arthritis, stripped tendon in thumb area (carpal tunnel), left shoulder problems, right leg surgery (L shaped bracket inserted-right hip), hip problems (need a hip replacement), and numbness in both legs.  (Admin Tr. 272).   His claims were initially denied on January 11, 2012.  Thereafter, Cantelupe requested, and was granted, an administrative hearing.  On June 6, 2013, with the assistance of his counsel, Cantelupe appeared and testified at an administrative hearing in Harrisburg, Pennsylvania before Administrative Law Judge Sharon Zanotto ("ALJ Zanotto").  Impartial vocational expert Paul A. Anderson ("VE Anderson") also appeared and testified.

Cantelupe testified that the biggest impediment to returning to work is the severity of his pain.  Medical records reflect that he sustained a meniscal tear in January 2006, and underwent arthroscopic surgery to repair this injury February 2006. (Admin Tr. 372, 409-10).  He reported

that on December 23, 2006, he was struck by a vehicle as a pedestrian, and suffered a displaced right femoral neck fracture of the right hip, and underwent a reduction internal fixation surgery.[2] (Admin Tr. 64, 287, 334-38). Two weeks after surgery, orthopaedic surgeon Dr. Ronald Lippe reported that Cantelupe was doing relatively well and felt good. (Admin Tr. 379-80). X-rays showed that the hardware inserted during the surgery was in excellent position, but that he did have some compression of his fracture and shortening of his femoral neck. Id. One week later Cantelupe returned to Dr. Lippe, and reported that his hip felt good. (Admin Tr. 381). Dr. Lippe noted that Cantelupe's range of motion was satisfactory, and recommended that Cantelupe participate in activities "within reason." Id. During the same examination Cantelupe reported that he was experiencing right shoulder pain. Id. An MRI revealed an impaction fracture of the greater tuberosity. (Admin Tr. 383). Dr. Lippe

---

[2]We note that Emergency Department records reflect that on December 22, 2006, a barkeeper found an obviously injured Cantelupe in an inebriated state behind a bar; his blood alcohol level was 0.19. (Admin Tr. 332-38). The police and EMS were called, and Cantelupe was transported to the Emergency Department where he was treated for a right eyebrow laceration and right hip fracture. Id. Cantelupe had no recollection of any injury that occurred, and was unable to give details about how he sustained his injuries. Id.

explained that the treatment for this type of fracture is decreased activity.

Id.  Cantelupe was instructed to use his shoulder as little as possible and return in five weeks for follow-up.  Id.

In February 2007 it was noted that Cantelupe's hip fracture was healing in a satisfactory position, although he still walked with a slight limp.  (Admin Tr. 385).  He also had a full range of motion in his right shoulder but exhibited a mildly positive impingement sign at 100 degrees of forward elevation that was worse with internal rotation.  Id. X-rays of his shoulder confirmed that his shoulder fracture remained nondisplaced. Id.  Cantelupe was instructed that he could continue to increase his activities within reason.  Id.  Dr. Lippe offered to prescribe physical therapy for his shoulder, but Cantelupe declined.  Id.  In September 2007, Cantelupe complained of increasing difficulty with his right hip and continued pain in his right shoulder.  (Admin Tr. 393).  Cantelupe's hip pain was localized to the hardware implanted in his hip, and x-rays revealed that the screws were somewhat prominent in the lateral aspect of his femur.  Id.  It was recommended that his hardware be surgically removed.  Id.  Dr. Lippe also noted that Cantelupe's range of motion in his

left shoulder was limited secondary to pain, he administered an injection and instructed Cantelupe to report back if his symptoms persisted. Id. Cantelupe received two such injections and did not make any further complaints of shoulder pain to Dr. Lippe.

Cantelupe had the hardware in his right hip excised on October 30, 2007. Two weeks after surgery he reported that he had no pain, and was walking without a limp. (Admin Tr. 398). Dr. Lippe instructed Cantelupe to participate in activities within reason, and to return in one year for a clinical recheck of his hip. (Admin Tr. 398).

In May 2008 Cantelupe presented to his primary care physician's office with complaints of severe hip pain. It was noted that Cantelupe was doubled over in pain. He was prescribed a 50mcg duragesic Fentanyl patch ("duragesic patch") and was referred back to Dr. Lippe for treatment. (Admin Tr. 357). The record reflects that Cantelupe did not return to Dr. Lippe until December 2011.[3] (Admin Tr. 400). Instead he

---

[3] Cantelupe's December 1, 2011 examination with Dr. Lippe was the last time he saw the doctor. (Admin Tr. 400). During that examination Cantelupe and Dr, Lippe discussed treatment options, and recommended a course of physical therapy. Id. Cantelupe stated that he would look in to physical therapy when he has insurance. Id. Cantelupe did not return
(continued...)

continued to follow up with his primary care physician, Dr. Brescia.  In June 2008, Cantelupe was seen at Dr. Brescia's office with complaints of severe back pain.  (Admin Tr. 357).  In July 2008, he was seen at Dr. Brescia's office with complaints of right hip discomfort.  Id.  In August 2008 Cantelupe was seen at Dr. Brescia's office with complaints of neck pain.  (Admin Tr. 356).  Between July 2007 and August 2008, Cantelupe was prescribed 50mcg duragesic patches for his pain.  Cantelupe did not fill any prescription for his duragesic patch between August 2008 and December 2009.  (Admin Tr. 314).  After more than a one year gap in his treatment records, Cantelupe returned to Dr. Brescia's office with complaints of back pain and swelling in his right leg following a hunting trip.  (Admin Tr. 356).  During this examination it was recommended that Cantelupe "remain off work," however Cantelupe told the clinician that he could not do so for financial reasons.  Id.  Following this visit, Cantelupe was prescribed 50mcg duragesic patches to manage his pain.  (Admin Tr. 314, 356).  Cantelupe did not return to Dr. Brescia's office for

---

[3](...continued)
to Dr. Lippe for any further treatment during the relevant period. (Admin Tr. 474).

approximately eleven months.

Cantelupe was examined by Dr. Brescia in November 2010 for treatment of right eye swelling. Although the treatment records do not contain any examination findings relating to Cantelupe's neck, back, hip, shoulder, or knee pain, prescription records reflect that he was prescribed 50mcg duragesic patches. (Admin Tr. 314, 421-22). In December 2010, Cantelupe was examined by Dr. Brescia with complaints of pain in his lower back and left buttocks that began one week ago. (Admin Tr. 423-25). On physical examination he was positive for paralumbar muscle spasms in the right lumbar spine. Id. His prescription for the 50mcg duragesic patches was renewed. Id. Cantelupe returned to Dr. Brescia's office in April 2011 with complaints of pain in his lower back and buttocks. Cantelupe described his pain as "annoying" and "moderate." (Admin Tr. 425-27). On physical examination, Dr. Brescia observed that Cantelupe exhibited paralumbar muscular spasm in his right lumbar spine, and right hip pain on palpation. Id. His prescription for 50mcg duragesic patches was renewed. Id.

On March 1, 2012, Cantelupe began to treat with Dr. William Nasuti. (Admin Tr. 456-59). Cantelupe complained of musculoskeletal pain in his lower leg that had persisted for the past year, and reported that duragesic patches had helped in the past. Id. On physical examination, Dr. Nasuti noted that Cantelupe walked with an antalgic gait, had muscle spasm in his lumbar spine, and exhibited instability in his left and right hips. Id. Dr. Nasuti prescribed 50mcg duragesic patches for Cantelupe's chronic pain. Id. When Cantelupe returned three days later to go over lab work Dr. Nasuti noted that Cantelupe walked with a partial weight-bearing antalgic gait to the right side, had right hip tenderness, and had moderate hip pain with motion; he did not note any joint instability in the hip. (Admin Tr. 463-66). Prescription records reflect that Cantelupe continued to fill his prescription for the 50 mcg duragesic patches on a regular basis. (Admin Tr. 314, 476). Dr. Nasuti noted that Cantelupe was stable on duragesic, but that Cantelupe continued to walk with an antalgic gait, exhibited muscle spasm in the lumbar spine, and presented on one occasion with right elbow swelling. (Admin Tr. 468, 471).

On March 4, 2013, Cantelupe was examined by Dr. Sandra Fowler ("Dr. Fowler").  He complained of pain that was a severity level of five, that was intermittent and getting worse over time.  (Admin Tr. 463-66).  On physical examination, Dr. Fowler noted spasm, a right-sided partial weight bearing antalgic gait, right hip tenderness, and moderate pain with motion.  Id.  Dr. Fowler increased the potency of Cantelupe's prescribed duragesic patch from 50mcg to 75mcg based on Cantelupe's reports that his patch was not lasting as long as it used to.  Id.

Cantelupe testified that he experiences pain and numbness in his legs, back, shoulders, and arms.  (Admin Tr. 64-65).  He alleged that he cannot hold his arms above his head for more than thirty seconds before they go numb.  Id.  He reported that, although he is in constant pain, the intensity of his pain increases when he engages in activities that require him to bend over or lift objects.  (Admin Tr. 66).  He alleged that his level of pain is consistently an eight out of ten.  (Admin Tr. 71).  Cantelupe testified that he can sit for no more than forty-five minutes at one time, stand for no more than fifteen minutes at one time, and is constantly

adjusting his position to minimize his pain.[4]  (Admin Tr. 70).  He also reported that he has not lifted anything weighing more than fifteen pounds since his alleged onset date. (Admin Tr. 78).  During an interview with a representative at the field office, the interviewer noted that Cantelupe was walking very slowly, and that while sitting he moved around because he was in constant pain.  (Admin Tr. 260).  He reported that each time he changes his duragesic patch he experiences side effects of euphoria and difficulty concentrating, and nausea for the first six to eight hours.  (Admin Tr. 72).

Cantelupe also reported that he has some difficulty performing activities that require the manipulation of small objects due to bilateral carpal tunnel syndrome.  (Admin Tr. 77-78).  He reported that although he is able to feed himself and use zippers, he has difficulty buttoning buttons.  (Admin Tr. 78).

Each morning, Cantelupe gets up between five and six o'clock.  Then he performs a series of leg and hip exercises to regain mobility in his legs

---

[4]Cantelupe later clarified that, although he could sit for forty-five minutes, he could not do so comfortably.  He reported that he can sit comfortably for only fifteen minutes.  (Admin Tr. 72).

and back.  After performing these exercises, he gets dressed and fixes himself a simple breakfast.  (Admin Tr. 66).  Before the onset of his conditions, Cantelupe used to enjoy hunting and fishing.  (Admin Tr. 67).  He reported that he has gone fishing since his alleged onset date, but has not done so since 2009 because it is difficult for him to walk along the riverbank to his fishing spots.  (See Admin Tr. 67-68)(testifying during his 2012 hearing that he had not gone fishing for three years).

Cantelupe testified that he is able to use public transportation.  (Admin Tr. 60).  He also reported that he is able to go to the post office, and goes grocery shopping for thirty minutes once every three weeks.  (Admin Tr. 63).

In addition to his hearing testimony, Cantelupe also made statements about the intensity, persistence, and limiting effects of his impairments in a function report and supplemental pain questionnaire completed in November 2011.  (Admin Tr. 279-88).  In his function report, Cantelupe reported that his conditions affected his ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, and use his hands.  (Admin Tr. 284).  He

stated that he could walk up to a quarter mile at one time, that his ability to pay attention was dependent upon his pain level,  that he generally finishes tasks that he starts, he follows written instructions well, gets along with authority figures, handles stress well, and handles changes in routine "O.K." (Admin Tr. 284-85).  Cantelupe also reported that he uses braces, heel lifts, and a cane "when needed" on a weekly basis. (Admin Tr. 285).

On September 17, 2013, the ALJ issued a decision denying Cantelupe's claims.  Thereafter, Cantelupe sought review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council").  Together with his request, Cantelupe submitted additional evidence that was not before the ALJ when she issued her decision. (Admin Tr. 8-14, 477-98).  On January 12, 2015, the Appeals Council denied Cantelupe's request for review.

On February 25, 2015, Cantelupe filed a timely complaint in this Court. (Doc. 1).  In his complaint, Cantelupe alleges that the ALJ's decision denying his claims contained an error of law, and is not supported by substantial evidence. (Doc. 1 ¶9).  As relief, he requests that the Court

reverse the ALJ's decision denying his claims and award him the benefits to which he is entitled, or in the alternative, grant him such other relief to which he may be entitled.  (Doc. 1 ¶16-18).   On May 6, 2015, the Commissioner filed an answer.   (Doc. 8).   In her answer, the Commissioner asserts that the final decision denying Cantelupe's claims is correct and in accordance with the law and regulations, and that the findings of fact contained therein are supported by substantial evidence. (Doc. 8 ¶8).  Together with her answer, the Commissioner filed a certified copy of the transcript of the record, including the evidence upon which the findings and decision complained of are based.  (Doc. 9).

This matter has been fully briefed by the parties, and is now ripe for decision.  (Doc. 10, 11).

III.   Legal Standards

A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C.

§1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200(3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536(M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v.</u>

Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Cantelupe is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

    B.    INITIAL BURDENS OF PROOF, PERSUASION, AND ARTICULATION FOR THE ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

16

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant

is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.   RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."   Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.   20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C.

§423(d)(5) by reference); 20 C.F.R. §§404.1512, 416.912; <u>Mason</u>, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."  <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and

which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.   LEGAL BENCHMARKS FOR THE ALJ'S EVALUATION AT STEP THREE OF THE SEQUENTIAL EVALUATION PROCESS

At step three of the sequential evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments that are acknowledged to be so severe as to preclude substantial gainful activity.   20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1; Burnett, 220 F.3d at 119.  In making this determination, the ALJ is guided by several basic principles set forth by the Social Security regulations, and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the Plaintiff is considered disabled per se, and is awarded benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, the claimant bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990)(italicized text in original); 20 C.F.R. §§

404.1520(d), 416.920(d).   An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient.  Id.

>    D.    Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The Commissioner's regulations defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions. 20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).  Regardless of its source, the ALJ is required to evaluate every medical opinion received.  20 C.F.R. §§404.1527(c), 416.927(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §§404.1527(c) and 416.927(c).  "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  SSR 96-6p, 1996 WL 374180 at *2.  Treating sources have the closest ties to the claimant, and therefore their opinions

are generally entitled to more weight.  See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §§404.1502, 416.902 (defining treating source).  Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight.  20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's

opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. §§404.1527(c), 416.927(c).

Further, it is important to note that 20 C.F.R. §§404.1527(e) and 416.927(e) provide that at the ALJ and Appeals Council levels of the administrative review process, findings by nonexamining State agency medical and psychological consultants must be evaluated as expert opinion evidence by nonexamining physicians and psychologists, and must address these opinions in their decisions.  However, opinions by State agency consultants can be given weight "only insofar as they are supported by evidence in the case record."  SSR 96-6p, 1996 WL 374180 at *2.  In appropriate circumstances, opinions from nonexamining State agency  medical or psychological consultants may be entitled to greater weight than the opinions of treating or examining sources.  Id. at *3.

Furthermore, as discussed above, it is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This principle applies with particular force to the opinion

of a treating physician. <u>See</u> 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)(quoting <u>Mason</u>, 994 F.2d at 1066)); <u>see also Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000).

E.   Legal Benchmarks for the ALJ's Assessment of the Credibility of a Claimant's Symptoms

A symptom is defined as "an individual's own description of his or her physical or mental impairment(s)." SSR 96-7p, 1996 WL 374186 at *2. "[T]he credibility of a claimant's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. <u>Id.</u> at *4. The regulations describe a two-step process for evaluating the credibility of a claimant's symptoms.

First, the ALJ must consider whether there is a medically determinable physical or mental impairment that could reasonably be expected to produce the symptom alleged. <u>Id.</u> at *2. Where there is no medically determinable impairment underlying the symptom or symptoms

24

alleged, the symptom(s) will not be found to affect the claimant's ability to basic work activities and will be excluded from the RFC assessment. 20 C.F.R. §§404.1529(b), 416.929(b). "[S]ymptoms ... will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." Id.

Second, the ALJ must evaluate the intensity and persistence of a claimant's symptoms, and determine the extent to which a claimant's symptoms limit the claimant's capacity for work. SSR 96-7p, 1996 WL 374186 at *2. "[W]henever the [claimant's] statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, the adjudicator must make a finding on the credibility of the [claimant's] statements based on a consideration of the entire case record." Id.

20 C.F.R. §§404.1529(c) and 416.929(c) describe the kinds of evidence, and list several factors that must be considered in addition to the objective medical evidence when assessing the credibility of unsubstantiated symptoms or functional limitations, including: daily

activities; statements about the location, duration, frequency, and intensity of the alleged symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms alleged; treatment other than medication the claimant receives or has received for symptoms relief; any measures the claimant uses or has used to relieve his or her symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  Additionally, the Commissioner's policy interpretation ruling on this issue provides additional factors to guide the ALJ's credibility assessment, including: the consistency of the claimant's statements both internally, and with the other information in the case record such as information provided by medical sources and statement made to treating and examining sources about his or her symptoms; any objective evidence demonstrating the effects the claimant's symptoms have on his or her ability to function; and, whether the longitudinal medical record shows that the claimant has made persistent attempts to obtain relief from his or her symptoms. SSR 96-7p, 1996 WL 374186.

In making a finding about the credibility of a claimant's statements,

the ALJ need not totally accept or totally reject the claimant's statements. Id. at *4.   The ALJ is empowered to find all, some, or none of the claimant's allegations to be credible but "cannot reject evidence for no reason or for the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)(quoting Mason, 994 F.2d at 1066).

Last, when faced with the task of reviewing an ALJ's findings based on the credibility of a claimant, it is important to be mindful of the fact that such determinations are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Frazier v. Apfel, No. 99-CV-715, 2000 WL 288246 *9(E.D. Pa. Mar. 7, 2000)(quoting Walters v. Comm'r of Soc. Sec, 127 F.3d 525, 531(6th Cir. 1997)).

IV.   DISCUSSION

   A.   ALJ'S DECISION DENYING CANTELUPE'S APPLICATIONS FOR BENEFITS

In her written decision denying Cantelupe's claims, the ALJ found that Cantelupe met the insured status requirements of Title II of the Social Security Act through December 31, 2010. (Admin Tr. 22).  At step one, the ALJ found that Cantelupe had not engaged in substantial gainful

activity between his alleged onset date of December 23, 2006, and the date the ALJ issued her written decision. (Admin Tr. 22). At step two, the ALJ found that Cantelupe had the following medically determinable severe impairments: degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the bilateral knees, and status-post open reduction and internal fixation ("ORIF") of the femur of the right hip. (Admin Tr. 23). The ALJ also found that Cantelupe suffered from the following medically determinable non-severe impairments: meniscus tear of the left knee status-post arthroscopy, impaction fracture of posterolateral aspect of the head and neck of the humerus with no osseous abnormality, right shoulder subacromial impingement syndrome, and generalized anxiety disorder. (Admin Tr. 23). The ALJ also noted that although there is evidence of occasional alcohol use, there is insufficient evidence to establish that Cantelupe has a medically determinable substance use disorder. Id. At step three, the ALJ found that Cantelupe did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin Tr. 23-24).

Before proceeding to step four of the sequential evaluation process, the ALJ was required to assess Cantelupe's RFC based on her consideration of all of Cantelupe's symptoms and limitations to the extent to which they can be reasonably accepted as consistent with the objective medical and other evidence based on the requirements of 20 C.F.R. §§404.1529, 416.929, and SSRs 96-4p and 96-7p.  In doing so the ALJ is also required to consider the opinion evidence of record in accordance with the requirements of 20 C.F.R. §§404.1527 and 416.927, and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  The ALJ found that Cantelupe had the RFC to engage in light work as defined in 20 C.F.R. §§404.1567(b) and 416.967(b) except that Cantelupe:

> must be able to sit/stand at will; no overhead reaching; and can occasionally crouch, kneel, stoop, crawl and climb ramps, stairs, ladders, ropes and scaffolds.

(Admin Tr. 24).  In doing so, the ALJ accorded substantial weight to the April 2012 physical RFC assessment of State agency medical consultant Dr. Shanker Gupta ("Dr. Gupta").  (Admin Tr. 27).  Dr. Gupta opined that Cantelupe could: occasionally lift or carry up to twenty pounds and frequently carry up to ten pounds; stand or walk up to six hours per eight-

hour workday; sit approximately six hours per eight-hour workday;
frequently climb stairs or ramps and balance; and, occasionally climb
ladders or scaffolds, stoop, kneel, crouch, reach overhead, and crawl.
(Admin Tr. 437-444). Dr. Gupta also opined that Cantelupe should avoid
concentrated exposure to extreme cold and hazards. Id. The ALJ also
noted that there were "no opinions from a treating or examining source to
suggest that the claimant's impairments preclude him from work activity.
(Admin Tr. 27).

At step four of the sequential evaluation process, the ALJ's findings
were informed by VE Anderson's testimony. Specifically, VE Anderson
testified that, based on the ALJ's findings of fact relating to Cantelupe's
RFC assessment, such an individual could not engage in Cantelupe's past
relevant work as a concrete finisher, warehouse worker, tire molder, or
television installer as generally or actually performed because all of the
positions exceed the exertional demands of light work. As such, the ALJ
found in Cantelupe's favor at step four by concluding that Cantelupe could
not engage in any of his past relevant work.

At step five of the sequential evaluation process, after making

additional findings of fact relating to Cantelupe's age and level of education, the ALJ once again consulted VE Anderson.  In response to a hypothetical question posed by the ALJ, VE Anderson testified that an individual with the same RFC and other vocational factors as Cantelupe could engage in "other work" that exists in the national economy.  VE Anderson testified that such an individual could engage in work as an information clerk (Dictionary of Occupational Titles ("DOT") #237.367-018), cashier, entertainment industry (DOT #211.462-010), and potato chip sorter (DOT #526.687-010).  The VE testified that these occupations exist in a total of approximately 395,000 jobs in the national economy.  As such, the ALJ found that Cantelupe could engage in other work that exists in the national economy in significant number, and concluded that he was not disabled under the Social Security Act.

B.   THE ALJ'S DETERMINATION THAT CANTELUPE'S IMPAIRMENT DOES NOT PREVENT HIM FROM AMBULATING EFFECTIVELY IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Cantelupe argues that the ALJ erred in her determination that he did not meet Listing 101.02 of 20 C.F.R Part 404, Subpart P, Appendix 1 ('the listing of impairments").  (Doc. 10 p. 4).  Cantelupe also argues that

the ALJ erred by failing to find Cantelupe "disabled" at step three of the sequential evaluation process.  (Doc. 10 p. 7).  Because these arguments are related we will address them together.

As an initial matter, we note that Listing 101.02 is in Part B of the listing of impairments.  Part B of the listing of impairments contains criteria that apply only to individuals who are under the age of 18.  20 C.F.R. §§404.1525(b)(2), 416.925(b)(2).   As of his alleged onset date, Cantelupe was forty-five years old.  As such, Listing 101.02 does not apply to his case.  In her reply, the Commissioner has identified the analogous Listing in Part A of the Listing of Impairments, and has construed Cantelupe's argument as if it were raised under Listing 1.02.  (Doc. 11 p. 16).

Listing 1.02A relates to a major dysfunction of a joint, due to any cause, that is:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints.  With:

32

> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b

20 C.F.R. Part 404, Subpart P, Appendix 1 §1.02.  Section 1.00 B2b defines the inability to ambulate as:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.   Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Part 404, Subpart P, Appendix 1 §1.00B2b1.  The regulation goes on to provide several examples of ineffective ambulation, including: the inability to walk without the use of a walker, two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to use standard public transportation; the inability to carry out routine ambulatory activities such as shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  20 C.F.R. Part 404, Subpart P, Appendix 1 §1.00B2b2.  In order to ambulate effectively "individuals must be capable

of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," and "travel without companion assistance to and from a place of employment."  Id.

In her decision, the ALJ found that Cantelupe's impairments did not meet Listing 1.02 because:

> there is no medical evidence that the claimant is unable to ambulate effectively or perform fine and gross movements effectively, as those terms are defined by the regulations.  While the claimant ambulates with one cane, he does not require the use of two canes or a walker.  Moreover, he only uses one hand for the cane.

(Admin Tr. 23).

Cantelupe contends that the ALJ erred when she concluded that there was no medical evidence that Cantelupe was unable to ambulate effectively.   In response, the Commissioner asserts that the ALJ's determination that Cantelupe did not meet or equal Listing 1.02A is supported by substantial evidence.

We agree with the Commissioner that the ALJ's determination that the combination of Cantelupe's impairments did not prevent him from ambulating effectively as it is defined by 20 C.F.R. Part 404, Subpart P,

Appendix 1 §1.00B2b is supported by substantial evidence.  In her written decision, the ALJ noted that although Cantelupe walks with a cane, his cane only requires use of one hand.  (Admin Tr. 23).  He does not require a walker or two canes to ambulate, Id., only uses a cane "when necessary," (Admin Tr. 25), and that it did not appear that Cantelupe's cane was prescribed.  (Admin Tr. 26).  The ALJ also noted that Cantelupe testified that he is able to use public transportation, go to the grocery store, and go to the post office.  (Admin Tr. 24-25).

Furthermore, because we find that the ALJ's determination that Cantelupe did not meet all of the criteria of Listing 1.02A is supported by substantial evidence, we also find that the ALJ did not err as a matter of law by failing to terminate her assessment at step three of the sequential evaluation process.

C.   THE ALJ'S FAILURE TO DISCUSS THE WEIGHT ACCORDED TO DR. BRESCIA'S RECOMMENDATION THAT CANTELUPE "REMAIN OFF WORK" WAS HARMLESS IN THIS CASE

Next, Cantelupe attacks the sufficiency of the ALJ's RFC assessment.  Specifically, Cantelupe asserts that the ALJ's evaluation of the medical opinion evidence of record was not in accordance with 20

C.F.R. §§404.1527 and 416.927.  In doing so, Cantelupe asserts that "[t]he opinion of a medical source that has examined a claimant must be weighted more than a source who has not" and that treating medical sources "must be given greater, if not controlling weight under 20 C.F.R. 404.1527(c)(2)."  (Doc. 10 p. 9).  Cantelupe also pointed out that the ALJ erroneously concluded that "there are no opinions from a treating or examining source to suggest that the claimant's impairments preclude him from working activity," while ignoring a December 2, 2009 treatment note from Dr. Brescia's office recommending that Cantelupe remain off work.  (Doc. 10 p. 11)(citing Admin Tr. 27, 356).  In her response, the Commissioner generously construes this statement as a medical opinion by Dr. Brescia and argues that it is entitled to no weight under 20 C.F.R. §§404.1527(d) and 416.927(d).

As an initial matter, we note that Cantelupe's argument and the Commissioner's response appear to be premised upon a misunderstanding of the regulations governing the evaluation of medical opinion evidence. Contrary to Cantelupe's assertions, 20 C.F.R. §§404.1527(c)(1) and 416.927(c)(1) provide that "[g]enerally, [the adjudicator will] give more

weight to the opinion of a source who has examined [the claimant]."

Similarly, 20 C.F.R. §§404.1527(c)(2) and 416.927(c)(2) provide that

"[g]enerally, [the adjudicator will] give more weight to the opinions from

[the claimant's] treating sources."  Neither of these regulations mandate

that in all cases the opinion of a treating source must be given greater

weight than an opinion by a State agency consultant.  In fact, in SSR 96-

6p, the Commissioner clarified that, "[i]n appropriate circumstances,

opinions from State agency medical and psychological consultants and

other program physicians and psychologists may be entitled to greater

weight than the opinions of treating and examining sources."  1996 WL

374180 at *3.

Moreover, although the Commissioner is correct that a statement

made by a medical source that a claimant is "unable to work" is not a

medical opinion as described in 20 C.F.R. §§404.1527(a)(2), and

416.927(a)(2), such opinions must never be ignored.   20 C.F.R.

§§404.1527(d), 416.927(d).

A statement that a claimant is unable to work is never entitled to

controlling weight because to do so would confer upon the medical source

the authority to make the determination or decision about whether a claimant is disabled and would be an abdication of the Commissioner's statutory responsibility.  20 C.F.R. §§404.1527(d)(3), 416.927(d)(3); SSR 96-5p, 1996 WL 374183 at *3.  In evaluating medical opinions on issues reserved to the Commissioner, the ALJ should apply the factors outlined in 20 C.F.R. §§404.1527(c) and 416.927(c).[5]  SSR 96-5p, 1996 WL 374183 at *3("it would be appropriate to consider the supportability of the opinion and its consistency with the record as a whole.").  As such, we are not persuaded by the Commissioner's argument that the December 2009 treatment recommendation is entitled to no weight simply because it is an opinion on an issue reserved to the Commissioner.   Nonetheless, we find that the ALJ's failure to discuss the December 2009 treatment note in her decision is harmless error in this case.

Even if we were to conclude that the December 2, 2009 treatment recommendation constitutes a treating medical source opinion, remand

_____

[5]At the time the Commissioner's Social Security Ruling 96-5p was enacted, the factors for evaluating medical opinions were codified at 20 C.F.R. §§404.1527(d) and 416.927(d).  See 20 C.F.R. §§404.1527(d)(1996), 416.927(d)(1996).   In 2012, 20 C.F.R. §§404.1527 and 416.927 were amended and paragraph d was redesignated as paragraph c.  77 FR 10651-01, 10656, 10657 (Feb. 23, 2012).

would not be warranted for further consideration of the opinion.[6]   Other

Courts have recognized that, where an ALJ fails to give good reasons on

the record for the weight accorded to treating source opinions, remand

may not be required if the error is a harmless de minimus procedural

violation.  Wilson v. Comm'r of Soc. Sec, 378 F.3d 541, 547 (6th Cir. 2004);

see e.g., Schanck v. Comm'r of Soc. Sec, No. No. 12-14837, 2014 WL

1304816 at *5(E.D.Mich. Mar. 31, 2014).   Such harmless error may

include the instance where "a treating source's opinion is so patently

deficient that the Commissioner could not possibly credit it."   Id.

Similarly, the Third Circuit has found that an ALJ's failure to discuss  a

one-time GAF rating does not warrant reversal where the treating source

did not explain the basis for his or her assessment and the ALJ clearly

_____

[6]There are certain evidentiary problems with considering the
December 2, 2009 treatment recommendation as a treating medical source
opinion.  Although the record reflects that the treatment note at issue was
submitted by Dr. Brescia's office, the note is unsigned.  To be considered
a medical opinion, a statement must be from an acceptable medical source
as defined by 20 C.F.R. §§404.1513(a), 416.913(a)(defining acceptable
medical sources as licensed physicians, licensed or certified psychologists,
licensed podiatrists, or qualified speech-language pathologists).  There is
no way to authenticate whether the recommendation in question was
made by an acceptable medical source.

considered the treatment records containing the omitted GAF score.[7] <u>See</u> <u>Gilroy v. Astrue</u>, 351 F.App'x 714, 716 (3d Cir. 2009).

Here, we must determine whether the ALJ erred by failing to discuss a one-time recommendation in an unsigned treatment note from Dr. Brescia's office, that Cantelupe should "remain off work."  Like the GAF score in <u>Gilroy</u>, there is no explanation as to how or why the clinician recommended that Cantelupe remain off work on December 2, 2009.  The recommendation does not specify how long Cantelupe should remain off work, cite to any objective evidence that forms the basis of the recommendation, explain why Cantelupe should remain off work, or discuss the nature of the work Cantelupe should discontinue.[8]  There is not

---

[7]Global Assessment of Functioning ("GAF") scores "are used by mental health clinicians and doctors to rate the social occupational and psychological functioning of adults."  <u>Irizarry v. Barnhart</u>, 233 F.App'x 189, 190 n. 1 (3d Cir, 2007); <u>see also</u> <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed. text rev. 2000)(hereinafter "DSM-IV TR"). The GAF scale ranges from 0 to 100, and is divided into ten ranges of functioning.  GAF scores constitute "medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." <u>Sweeney v. Comm'r of Soc. Sec.</u>, 847 F.Supp.2d 797, 802 (W.D.Pa. 2012)(quoting <u>Wiggers v. Astrue</u>, 2010 WL 1904015, at *8 (W.D.Pa. May 10, 2010)).

[8] We note that Cantelupe expressly denied that he engaged in any
(continued...)

enough explanation for the nature or basis of this opinion for the ALJ to conduct any meaningful evaluation of it.  See e.g., Schanck, 2014 WL 1304816 at *5("An ALJ cannot be expected to elaborate upon relevant factors for which no evidence exists.").  Further, although the ALJ did not specifically reference the recommendation that Cantelupe remain off work, she did discuss the underlying reports in her decision.  Accordingly, we find that although the ALJ failed to explain her implicit rejection of the December 2, 2009 recommendation that Cantelupe remain off work, her failure to do so is harmless error.

D.  The ALJ's Assessment of Cantelupe's credibly established limitations is Supported by Substantial Evidence, and the ALJ's Evaluation of Cantelupe's RFC is based on her consideration of All the Relevant Evidence

Next, Cantelupe argues that the ALJ's RFC assessment that he

---

[8](...continued)
paid work after December 23, 2006, even after the ALJ brought several treatment notes suggesting otherwise to Cantelupe's attention.  (Admin Tr. 53-54); see e.g. (Admin Tr. 346, 348)(noting that Cantelupe was a self-employed construction worker in July 2008); (Admin Tr. 400)(a December 2011 treatment note reflecting that Cantelupe told Dr. Lippe that he cannot work anymore because he usually works on concrete and cannot do that now); but see (Admin Tr. 425)(noting that Cantelupe's employment status was "not working" on April 13, 2011); (Admin Tr. 428)(noting that Cantelupe's employment status was "not working" on December 2, 2011).

could engage in a range of light work is not supported by substantial evidence because the ALJ failed to consider all of the relevant evidence and failed to account for all of Cantelupe's credibly established limitations.  Specifically, Cantelupe alleges that the ALJ failed to consider evidence suggesting that he was more physically limited than the ALJ's RFC assessment reflects, and erroneously found that the record did not support a finding that Cantelupe's pain and medication side effects would result in him being off-task approximately fifteen percent of each workday.

First Cantelupe alleges that the ALJ failed to consider numerous pieces of evidence demonstrating that he is more physically limited than found by the ALJ.  We construe this as an argument that the ALJ failed in her obligation to consider "all the relevant evidence" in Cantelupe's case record when making an RFC assessment pursuant to 20 C.F.R. §§404.1545(a) and 416.945(a).  The evidence that Cantelupe cites in support of his argument includes: Cantelupe's own statements in a November 2011 Function Report, (Admin Tr. 284); one page of notes from Dr. Brescia's office that summarizes four examinations between October

2007 and July 2008, (Admin Tr. 357); treatment notes from examinations dated March 1, 2012, November 14, 2012, and August 16, 2012, signed by Dr. Nasuti at Family Care Silver Spring, (Admin Tr. 457, 468, 471); and treatment notes from an examination dated March 4, 2013, signed by Dr. Sandra Fowler, (Admin Tr. 463-66).   We find that this argument lacks merit.   Our own review of the ALJ's decision reveals that, contrary to Cantelupe's assertions, the ALJ's decision does reflect that she considered the above-cited evidence.   She expressly noted that "[o]n his disability paperwork [Cantelupe] indicated that his limitations include walking, standing, operating equipment, lifting, crawling, and lifting objects above the head," and affected his ability to "squat, stand, reach, walk kneel, sit, climb stairs, use his hands, follow instructions, concentrate and complete tasks." (Admin Tr. 24).   Furthermore, although she did not mention the individual medical sources by name, the ALJ cited to each of the treatment notes that Cantelupe argues that she failed to consider. Accordingly, we find that Cantelupe's argument that the ALJ failed to consider all of the relevant evidence of record lacks merit.

Next Cantelupe argues that the ALJ failed to account for all of his

credibly established limitations.  As an initial matter, the Commissioner's

regulations and the Third Circuit, have established some guidelines as to

when a limitation is credibly established.  In <u>Rutherford v. Barnhart</u>, the

Third Circuit explained that:

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (<u>Burns</u>, 312 F.3d at 123).  Relatedly, the ALJ may not substitute his or her own expertise to refute such evidence (<u>Plummer</u>, 186 F.3d at 429).  Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible – the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1996); Reg § 929(c)(4)).  Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible.  In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it (Reg. §929(c)(3)).

399 F.3d at 554.

With this framework in mind, we turn to a consideration of the

particular limitation that Cantelupe claims were improperly disregarded

by the ALJ.  Cantelupe alleges that the ALJ's determination that the

44

record did not support a finding that Cantelupe's pain would result in being off-task 15% of the workday is not supported by substantial evidence. He asserts that the ALJ failed to account for Cantelupe's testimony that his prescribed duragesic patches induce a euphoric state for six to eight hours after their initial application, and impair Cantelupe's concentration. The parties do not dispute that the ALJ did not include a provision that Cantelupe would be limited to a position that would allow him to be off-task 15% of each workday in his RFC assessment, and, although this limitation was conveyed to VE Anderson, (see Admin Tr. 91), the ALJ did not rely on VE Anderson's response to that particular hypothetical. However, we find that the ALJ's determination that Cantelupe's testimony concerning his concentration deficits was not entirely credibly is supported by substantial evidence.

In her decision, the ALJ found that:

> In terms of the claimant's alleged off task behaviors, the record does not support that the claimant has significant pain such that he would be off task 15% of the workday (Testimony). Rather, medical records reveal that the claimant denied any concentration difficulties (Exhibit 15F/6). Records also do not support that he would require significant work absences or unscheduled breaks.

45

> To the contrary, the claimant only requires routine medical care for moderate symptomatology that would not warrant significant work absences or unscheduled breaks. The undersigned questions the claimant's credibility given the contrast of his allegations from the objective medical evidence. Moreover, the claimant has provided inconsistent statements, which renders his testimony less persuasive. For example, at the hearing the claimant denied working after the alleged onset date, but the medical records reveal several instances that the claimant indicated that he continued to work (Exhibit 2F/1, 3, 5).

(Admin Tr. 27). In reaching this determination, the ALJ expressly discussed Cantelupe's testimony about the severity of his medication side effects (Admin Tr. 25)(noting that Cantelupe "testified that for the first 6-8 hours of using the patch, he experiences a euphoric feeling and is unable to concentrate."). Furthermore, the ALJ accurately noted Cantelupe denied any difficulty concentrating in recent medical records while he was prescribed the 50mcg duragesic patches. (see also Admin Tr. 467). The objective evidence of record is also a notable for the absence of any report of medication side effects.

Accordingly, we find that Cantelupe's arguments that the ALJ failed to consider certain medical records, and failed to account for Cantelupe's

medication side effects, lack merit.

V.    RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner of Social Security be AFFIRMED and that Cantelupe's request for the award of benefits be DENIED. We also recommend that remand for a new administrative hearing would not be appropriate in this case.

 s/ Joseph F. Saporito, Jr.
Joseph F. Saporito, Jr.
U.S. Magistrate Judge

Dated: December 17, 2015

47

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Roger Lee Cantelupe,        :     Civil No. 1:15-CV-00410
                    :
        Plaintiff,    :     (Judge Kane)
                    :     (Magistrate Judge Saporito)
    v.                :
                    :
Carolyn W. Colvin,        :
Acting Commissioner of     :
Social Security           :
                    :
        Defendant.   :

## NOTICE

Notice is hereby given that the undersigned has entered the foregoing Report and Recommendation dated December 17, 2015. Any party may obtain a review of this Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified     proposed findings or

recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and

Recommendation may constitute a waiver of any appellate rights.

Dated: December 17, 2015         s/ Joseph F. Saporito, Jr.
                                 Joseph F. Saporito, Jr.
                                 U.S. Magistrate Judge